1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10   RICHARD ERNEST ANAYA,

11          Plaintiff                    No. CIV S-07-0029 GGH P

12      vs.

13   ROSEANNE CAMPBELL, et al.,

14          Defendants.              ORDER

15   _____/

16   I.  Introduction and Summary

17              Plaintiff is a prison inmate proceeding with appointed counsel with a civil rights

18   action.  Plaintiff proceeds with claims under the Eighth Amendment regarding deliberate

19   indifference to serious medical needs, the Americans with Disabilities Act (ADA), and state law

20   medical malpractice that span several years at Mule Creek State Prison (MCSP).  This action is

21   before the undersigned pursuant to both parties consent.  Docs. 212, 214.

22              As the procedural history, *infra*, indicates, the case has been an adjudication

23   nightmare.  It starts out with a complaint with too many defendants, too many or amorphous

24   claims, seriatim requests for injunctive relief and numerous amendments and motions.  It is only

25   one of hundreds of pending prisoner cases which the undersigned maintains at any one time

26   (amongst the myriad of other case related duties both criminal and civil assigned to magistrate

1

judges).  As is often the case, numerous requests for counsel are made during the course of the

case, but it is almost always not possible to determine whether to expend one of the scarce

counsel resources maintained in the district on account of the murkiness of the allegations and

the less than apparent possibility of success.[1]

This motion for summary judgment is especially difficult to adjudicate in light of

the lengthy period of time under review, the copious amount of medical examination/procedures

supplied to plaintiff, the waxing and waning of his conditions, and finally, the amorphous or

conclusory description of those precise events, or non-events, which plaintiff believes constituted

deliberate indifference and/or a violation of the ADA.  The undersigned will not reach out to

adjudicate claims not precisely made by plaintiff's counsel, and will not reach claims determined

to be abandoned at some time in this litigation.

II.  Procedural History

This action proceeds against defendants Akintola, Nale, Smith, Subia, Williams

and Campbell.  Defendants Huerta-Garcia and Johnson were dismissed by the parties on

February 25, 2011, as was the retaliation claim against Smith.  Doc. 291.  This case has a rather

extensive procedural history which is set forth below.

This action commenced on January 5, 2007, naming 13 defendants for various

federal and state law claims.  A request for writ of mandate was filed no more than 14 days after

the complaint's filing.  Motions for immediate injunctive relief were made before the complaint

---

[1] Unlike appointment on appeal, or appointment in the district court for a specific purpose only, committing to be on the § 1983 panel to be counsel throughout a case is a significant undertaking.  Many cases take years to come to judgment during which time counsel will have made many appearances both in court and outside of court in discovery matters, will have undertaken expert investigation, and perhaps will have been involved in various ADR efforts. Continuous contact with one's incarcerated client is difficult and time consuming to say the least. Counsel may sometimes expend monetary resources for which no reimbursement is forthcoming. Pro bono counsel in court is not filing a brief or two and it's over.  It is difficult to find counsel who have the time and monetary resources required in a case.  The undersigned is reluctant to seek to impose such burdens on volunteer counsel in a case where a plaintiff's chance of success cannot even be determined to be a reasonable possibility.  At times it takes quite a while to understand that a plaintiff may have colorable claims.

1    could be screened in the normal process.  Suffice it to say that with respect to ADA allegations,

2    some of the preliminary relief motions had facial merit, and during the course of a year, most of

3    the necessary relief was worked out or problems were mooted.

4             On August 23, 2007, defendants first appeared in this action by filing a motion to

5    dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  On December 5, 2007, the court recommended that

6    defendants' motion be denied as to the Eighth Amendment medical claims against Smith.  The

7    court ordered the motion granted with leave to amend as to the claims against the other

8    defendants.  On May 29, 2008, plaintiff filed the operative amended complaint naming some of

9    the original defendants and as well as several new defendants.  Docs. 86, 88.  On June 26, 2008,

10   the court ordered the original defendants to answer the amended complaint and ordered service of

11   the new defendants.  On August 26, 2008, the original defendants filed an answer to the amended

12   complaint.  On November 4, 2008, several of the newly named defendants also filed an answer to

13   the amended complaint.

14            On November 10, 2008, the court issued a scheduling order setting the dispositive

15   motion cut-off date for June 19, 2009.  On January 22, 2009, the remaining newly named

16   defendants filed an answer to the amended complaint.

17            On February 27, 2009, defendants filed a motion to modify the scheduling order.

18   Defendants requested that the court extend the discovery cut-off and dispositive motion filing

19   dates because new defense counsel had been assigned.  On March 13, 2009, the court granted this

20   motion, and re-set the dispositive motion cut-off date to August 19, 2009.

21            On August 17, 2009, defendants filed a 25 page motion for judgment on the

22   pleadings.  The grounds of the motion were that plaintiff failed to exhaust his administrative

23   remedies as to all defendants but for Smith and Williams and that several of the claims were not

24   ////

25   ////

26   ////

1  colorable.[2]

2          On August 14, 2009, defendants also requested that the court vacate the current

3  deadline for dispositive motions pending resolution of the motion for judgment on the pleadings,

4  and re-set the deadline if necessary following resolution of that motion so that defendants may

5  file a summary judgment motion.  The court declined at that time to give defendants another bite

6  at the summary judgment apple.

7          On November 9, 2009, the court issued findings and recommendations on the

8  judgment on the pleadings.  Several of the defendants were dismissed, however defendants

9  motion to dismiss for failing to exhaust administrative remedies was denied.  Doc. 207.[3]

10         Other motions for summary judgment were made by certain defendants.  The

11  court will not detail here all of the motions which led to the final roster of defendants as set forth

12  in the pretrial order.  However, as a result of all motions, and a dismissal of several defendants by

13  plaintiff himself, the defendants remaining are those set forth in the Pretrial Order and as set forth

14  the section to follow.  Suffice it to say that the court was compelled to spend an inordinate

15  amount of time determining what defendants should stay and go in this litigation.

16         Trial commenced in this case for only one day on Monday, October 25, 2010.  It

17  became quite apparent that plaintiff was unable to competently present his case.  Despite

18  plaintiff's efforts, he was simply not articulate enough to function coherently in the courtroom.

19  As a result the court declared a mistrial.  In weighing various options the court indicated to

20  plaintiff that the court would attempt to find plaintiff counsel, but noted that the court did not

21  have the authority to force an attorney to represent plaintiff.  The court also expressed its view

22  that since the determination to mistry the case would benefit plaintiff, defendants would be

23

24         [2] Separate counsel representing a different defendant filed a motion for summary
   judgment on August 17, 2009, that was granted and that defendant was dismissed.

25
26         [3] The court discussed in detail why the motion to dismiss for failure to exhaust should be
   denied.  Doc. 207.

1  provided an opportunity to file a motion for summary judgment.

2  　　　　On January 4, 2011, counsel was appointed for plaintiff to oppose defendants'

3  anticipated motion for summary judgment that was filed on February 25, 2011.  On March 8,

4  2011, the parties filed a briefing and hearing schedule and all briefings were to be filed by May 5,

5  2011, and the hearing on the summary judgment motion was to occur on May 19, 2011.  On May

6  2, 2011, a few days before the summary judgment opposition was to be filed, plaintiff's counsel

7  filed a request to reopen discovery for six months and to continue the summary judgment hearing

8  at a date after the close of discovery.  The court denied this request on May 4, 2011, noting that

9  the request was far too broad but provided plaintiff ten days to describe in detail what discovery

10  was needed and how long it would take to obtain it.  Plaintiff's counsel filed a response on May

11  13, 2011, and then on May 19, 2011, filed a motion to withdraw as attorney.

12  　　　　New counsel was appointed for plaintiff and the opposition to summary judgment

13  was finally filed on July 25, 2011.  Defendants filed a reply on August 12, 2011.

14  　　　　No requests by plaintiff's counsel to incur reimbursable expert witness

15  appointments pursuant to Eastern District General Order 230 were made.

16  III.  Threshold Issues

17  　　A. *The Claims Remaining*

18  　　　　As indicated above, much water has gone over the litigation dam in this case,

19  although the parties in some respects fail to recognize such.  Especially important is plaintiff's

20  failure to understand that the Pretrial Order issued on July 7, 2010, (Doc. 236) governs and

21  delimits the factual issues that may be raised in this case, except to the extent that plaintiff has

22  further abandoned any issues set forth in that Order.

23  　　　　In that Order, which recognizes the overarching legal claims of Eighth

24  Amendment deliberate indifference, state law medical malpractice and the ADA, the court found

25  specific factual issues to be adjudicated:

26  　　　　　　1. Plaintiff has alleged that he suffers from the conditions of rectal prolapse and

5

1   knee injury/ailments; *these conditions, and only these conditions, are pertinent to this case.*

2

3   Pretrial Order at 3 (emphasis added). [4]

4   This ruling was made in light of the difficulty to ascertain the precise factual

5   issues as stated in the operative complaint(s), plaintiff's tendency to attempt to muse about

6   ailments during the various motions or other pleadings in this case that were not in his operative

7   complaint, and upon which notice or exhaustion had transpired.  The ruling was also made

8   especially in light of plaintiff's pretrial statement.  The pretrial statement, including the important

9   specification of issues to be litigated, is not a meaningless document upon which the parties may

10   later expand in their unfettered discretion.  Thus, addition by plaintiff here of a back injury or

11   other ailment, as serious medical conditions ripe for adjudication, is simply barred by the court's

12   previous order.[5]

13   Further, as set forth in footnote 3 of the Pretrial Order, with respect to the ADA

14   claims, the only claims which the court could discern from the pretrial statement, and thus the

15   only claims to be adjudicated herein, were that "plaintiff was unable to participate in work and

16   educational programs because plaintiff was not provided with grab bars, crutches, canes and a

17   special toilet seat."  Thus, the attempt to expand (once again) the factual issues in this case, e.g.,

18   not permitting cell feeding at unspecified times, or not providing in-cell education, and start from

19   scratch as if none of what has transpired in the past four years matters, is not an attempt the court

20   will recognize as valid.

21   On February 25, 2011, plaintiff abandoned the retaliation claim posited against

22

23   [4]  The undersigned considers fecal incontinence so related to the rectal prolapse that such condition is at issue according to the Pretrial Order.

24

25   [5]  The undersigned was surprised concerning the apparent fact that many factual issues were abandoned in plaintiff's pretrial statement.  But the undersigned could not  read plaintiff's mind to determine the reasons for the omissions, or counsel him about his strategy– at least if the

26   undersigned is to remain a neutral adjudicator and not an advocate.

1   defendant Smith.  Thus, the court will adjudicate the three legal claims set forth above as

2   described by the remaining factual issues within those claims

3         B.  *Defendants Appropriate to the Remaining Claims.*

4         In the Pretrial Order, the court found that only defendants Subia, Smith, Williams,

5   Akintola, Nale Huerta-Garcia, Johnson and Campbell were appropriate defendants.  The

6   undersigned has re-reviewed this case and defendant Campbell continues as a defendant only as a

7   defendant in her official capacity, and along with her replacement, defendant Subia, the only

8   appropriate defendants for an ADA Title II claim.[6]  Plaintiff has attempted to add Eighth

9   Amendment claims against these defendants, in their roles denying inmate grievances for

10  medical care, which are not part of this action and which will not be addressed.

11  IV.  Motion for Summary Judgment

12            Legal Standard for Summary Judgment

13        Summary judgment is appropriate when it is demonstrated that there exists "no

14  genuine issue as to any material fact and that the movant is entitled to judgment as a matter of

15  law."  Fed. R. Civ. P. 56(c).

16        Under summary judgment practice, the moving party

17        always bears the initial responsibility of informing the district court
          of the basis for its motion, and identifying those portions of "the
18        pleadings, depositions, answers to interrogatories, and admissions
          on file, together with the affidavits, if any," which it believes
19        demonstrate the absence of a genuine issue of material fact.

20  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (quoting Fed. R. Civ.

21  

22        [6]An ADA claim involving the actions of a state agency is only appropriately brought
    against the state entity involved– not the individual employed by the state.  Vinson v. Thomas,
23  288 F.3d 1145, 1156 (9th Cir. 2002).  However, because an action against a state official in
    official capacity is an action against the state itself, Kentucky v. Graham, 473 U.S. 159, 165-66
24  (9th Cir. 2002), although the better practice is to name the entity itself.  Valadez-Lopez v.
    Chertoff, 2011 WL 3805890 (9th Cir. 2011 *7 (fn.3)).  Warden Subia as the successor to Warden
25  Campbell, is the only appropriate defendant for the ADA claim for money damages.  Any claim
    for injunctive relief is moot at this point due to plaintiff's transfer to a different institution than
26  that involved here.

P. 56(c)).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive

issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings,

depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment

should be entered, after adequate time for discovery and upon motion, against a party who fails to

make a showing sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial.  See id. at 322, 106 S. Ct. at 2552.

"[A] complete failure of proof concerning an essential element of the nonmoving party's case

necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment

should be granted, "so long as whatever is before the district court demonstrates that the standard

for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323, 106 S. Ct. at

2553.

        If the moving party meets its initial responsibility, the burden then shifts to the

opposing party to establish that a genuine issue as to any material fact actually does exist.  See

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356

(1986).  In attempting to establish the existence of this factual dispute, the opposing party may

not rely upon the allegations or denials of its pleadings but is required to tender evidence of

specific facts in the form of affidavits, and/or admissible discovery material, in support of its

contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11,

106 S. Ct. at 1356 n. 11.  The opposing party must demonstrate that the fact in contention is

material, i.e., a fact that might affect the outcome of the suit under the governing law, see

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec.

Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the

dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the

nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

        In the endeavor to establish the existence of a factual dispute, the opposing party

need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

genuine need for trial.'" Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P.

56(e) advisory committee's note on 1963 amendments).

        In resolving the summary judgment motion, the court examines the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587, 106 S. Ct.

at 1356.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

obligation to produce a factual predicate from which the inference may be drawn.  See Richards

v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902

(9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than

simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record

taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

'genuine issue for trial.'" Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (citation omitted).

        Undisputed Facts

        The following of defendants' undisputed facts (DUF) are either not disputed by

plaintiff, or following the court's review of the evidence submitted, have been deemed

undisputed:

        During the relevant period of October 2003 to November 2007, plaintiff received

67 primary care physician visits, 43 with medical doctors and the remaining 24 with physicians

assistants or nurse practitioners.  DUF #216.  From 2003 to 2007, plaintiff received three

////

////

surgeries by independent outside medical facilities, one to repair his rectal prolapse[7] and two

ACL reconstructions for his knee.  DUF #217.  From 2003 to 2007, plaintiff received numerous

gastroenterolology consultations with UC Davis physicians concerning his rectal prolapse and

numerous orthopedic consultations with outside orthopedists.  DUF #218.  From 2003 to 2007,

plaintiff received five x-rays of his knee over a two-year period and two MRIs of his knee over a

four-year period.  DUF #219.

<u>Medical Care for Knee</u>

It is undisputed that plaintiff had knee injuries and was treated prior to the

relevant period of this case, therefore the court will only include the treatment from the relevant

period.  On February 10, 2003, plaintiff re-injured his knee and was provided treatment that

included a wrap, crutches and a medical lay in.  DUF #171.  While shooting a basketball plaintiff

re-injured his knee on March 24, 2003, and received treatment, an ace bandage wrap, Motrin and

a medical lay in.  DUF #172.  On May 17, 2003, plaintiff re-injured his knee while running to

class.  DUF #173.  On May 29, 2003, plaintiff told doctors for the first time that he wanted knee

surgery.  DUF #174.  On that day plaintiff was diagnosed with a chronic right knee injury that

was not symptomatic and plaintiff was given a chrono for a low bunk, a modified work

restriction for one year and an orthopedic consultation was submitted.  DUF #176

On October 11, 2004, plaintiff re-injured his knee when he fell down some steps.

DUF #179.  On October 20, 2004, plaintiff saw a different orthopedist, who diagnosed a right

ACL tear and medial meniscus tear and planned on performing an ACL reconstruction.  DUF

#181.  On May 27, 2005, plaintiff received the ACL reconstruction.  DUF #182.  Following

surgery, plaintiff was discharged back to MCSP with crutches and weight bearing as tolerated for

six weeks.  DUF #183.

---

[7] Rectal prolapse is a condition where the tissue that lines the rectum falls down into or sticks through the anal opening.  DUF #116.  A person with rectal prolapse can experience discomfort during a bowel movement and if the bowel movement is accompanied by a significant prolapse then pain may be experienced until after the bowel movement.  DUF #118.

1    Plaintiff later reported feeling a pop in his knee with pain.  DUF #184.  During

2  follow up treatment it was assessed that plaintiff possibly re-injured his knee.  DUF #185.  More

3  treatment followed including extended use of crutches, an MRI, orthopedic consultations and a

4  second ACL surgery on September 26, 2007.  DUF #186.  Following the second surgery plaintiff

5  was provided with a knee brace, wheelchair, physical therapy, bottom bunk in a ground floor cell

6  assignment and crutches.  DUF #187.

7                                   Medical Care for Rectal Prolapse

8    Plaintiff's rectal prolapse first came to the attention of MCSP staff on October 28,

9  2003.  DUF #125.  Plaintiff reported that he had been suffering from the problem for the prior

10  two years and that it had increased to the point of mucosa prolapsing with every bowel

11  movement and had become difficult to manage.  DUF #126.  Surgical intervention through an

12  outside provider was requested on an urgent basis and approved two days later on October 30,

13  2003.  DUF #127.  Plaintiff was evaluated by UC Davis Medical Center on November 5, 2003.

14  DUF #128.  Plaintiff had a prolapse during a bowel movement on December 24, 2003, and was

15  unable to manually reinsert the mucosa as he had been able to in the past.  DUF #129.  Plaintiff

16  was taken to UC Davis where emergency rectal prolapse surgery was performed on December

17  26, 2003, by non defendant Dr. Vidovsky.  DUF #130.  Plaintiff was discharged from UC Davis

18  on January 3, 2004, apparently with complete recovery.  DUF #131.

19    Following the surgery plaintiff continued to have prolapses as well as complaints

20  of fecal incontinence.  DUF #132.  Dr. Vidovsky determined that the incontinence was a

21  preexisting problem from before the surgery but related to the rectal prolapse.  DUF #133.  Three

22  months after the surgery, Dr. Vidovsky determined that further improvement was unlikely and a

23  diverting colostomy was an option.  DUF #134.  Plaintiff refused the diverting colostomy.  DUF

24  #135.

25    On October 8, 2004, plaintiff was brought to the infirmary with a ½" prolapse and

26  was treated by defendant Dr. Smith.  DUF #136.  An exam did not reveal any active bleeding and

was the expected normal color of the rectal lining.  DUF #138.  Dr. Smith did not provide

plaintiff with in cell feedings, because he did not believe it was medically necessary.  DUF #142.

Plaintiff and Dr. Smith disagreed about the proper course of action to further deal with the rectal

prolapse condition.  By March 20, 2006, Dr. Vidovsk determined that plaintiff's rectal prolapse

condition appeared to be permanent and plaintiff would not benefit from further surgery.  DUF

#146.

Disability Accommodations

On November 5, 2007, an evaluation was conducted to determine plaintiff's

disability status.  DUF #191.  It was concluded that plaintiff had a permanent condition that

would benefit from the assistance of a commode chair by allowing plaintiff to support himself

with his upper extremities while using the toilet.  DUF #192; Decl of Dr. Smith Exh. G.  It was

recommended that a commode chair be placed in plaintiff's cell and he provided with adult

diapers when out of his cell.  Id.  It was specifically found that plaintiff's disability was not

confirmed upon examination.  DUF #193.  It was also concluded that plaintiff had a temporary

condition that required the use of crutches.  DUF #194;  Decl of Dr. Smith Exh. G.  Plaintiff was

provided with a commode chair.  DUF #207.  Plaintiff had a cane for most of his period at

MCSP.  DUF #210.  During the period of October 2003 to November 2007, plaintiff was

provided with dozens of medical chronos for medical lay ins, in cell feeds, single cell housing,

low bunk, low floor housing, special consideration for work and education assignments and

special access to bathrooms during work and classes.  DUF #221.

Defendants

Defendant Campbell was warden of MCSP from September 2004 to December

2006.  DUF #51.  Defendant Subia was warden of MCSP after Campbell.  DUF #77.

Defendant Dr. Williams was Chief Medical Officer at MCSP from 2001 until

2008.  DUF #79.  Dr. Williams role is generally administrative in nature and he generally does

not treat inmates.  DUF #80, 81.  Part of Dr. Williams job is to review inmates grievances

1  regarding medical care.  DUF # 78, 82.  Dr. Williams reviewed plaintiff's 2003 inmate grievance

2  MCSP-03-01668, concerning plaintiff's renewal of a walking cane and shaving chrono.  DUF

3  #86.  Dr. Williams noted that plaintiff was to soon be seen for an outside orthopedic evaluation.

4  DUF #87.  Dr. Williams provided plaintiff with a cane chrono until his outside orthopedic

5  evaluation.  DUF #89.

6         Dr. Williams also reviewed plaintiff's 2007 inmate grievance MCSP-A-07-01754,

7  concerning plaintiff's request for knee surgery.  DUF #90.  Dr. Williams noted that plaintiff had

8  already been scheduled for knee surgery, but could not be informed of the date due to security

9  reasons.  DUF #91.

10         Defendant Dr. Smith is the Chief Physician and Surgeon at MCSP.  DUF #93.  On

11  October 8, 2004, plaintiff was brought to the infirmary with a ½" prolapse and was treated by

12  defendant Dr. Smith.  DUF #136.  An exam did not reveal any active bleeding and was the

13  expected normal color of the rectal lining.  DUF #138.  Dr. Smith did not provide plaintiff with

14  in cell feedings, because he did not believe it was medically necessary.  DUF #142.  Plaintiff and

15  Dr. Smith disagreed about the proper course of action to further deal with the rectal prolapse

16  condition.  Dr. Smith did not provide plaintiff with in cell feeding, because he did not believe it

17  was medically necessary.  DUF #142.  Plaintiff chose to go to Ad. Seg., rather than return to his

18  cell without in cell feeding.  DUF #141.

19         Dr. Nale was a doctor in 2006 on the A Facility yard.  DUF #98.  Dr. Nale first

20  saw plaintiff on March 15, 2006, simply to confirm that plaintiff had an appointment with an

21  outside doctor for an orthopedic consult.  DUF #99-101.  Plaintiff mentioned his knee was

22  bothering him due to sitting for long periods of time in his education assignment and he wanted a

23  medical lay in and in cell feed, but Dr. Nale found nothing significant.  DUF #103.  Dr. Nale

24  concluded there was no medical reason for a lay-in or in cell feed and denied these requests.

25  DUF #104.  Dr. Nale did re-new plaintiff's knee brace chrono.  DUF #105.  This was the only

26  time plaintiff mentioned any knee issues to Dr. Nale.  DUF #106.

On April 20, 2006, Dr. Nale re-submitted defendant Akintola's GI referral as a validation for Akintola's previous request for a GI referral.  DUF #107.  On August 31, 2006, Dr. Nale treated plaintiff for a skin issue unrelated to plaintiff's knee or rectal prolapse.  DUF #112.  Dr. Nale provided plaintiff with a chrono for a medical lay in and in cell feed through September 8, 2006.  DUF #113.

Disputed Facts

Dr. Williams contends that he never personally treated plaintiff, he just reviewed the appeals discussed above.  DUF #85.  However, plaintiff alleges that Dr. Williams treated him four times regarding his knee and rectal prolapse.  Plaintiff's Declaration (Pl. Decl.) ¶38.  Though, plaintiff does not describe the substance of these examinations.

Dr. Smith contends that his position was generally as administrator of the MCSP staff.  DUF #94.  Plaintiff states that Dr. Smith examined him three times for his knee and rectal prolapse.  Pl. Decl. ¶39.

Dr. Nale states that plaintiff never asked him for any assistive device such as grab bars or a commode chair.  DUF #144.  Plaintiff states that he asked Dr. Nale for grab bars or a commode chair PUF #114.[8]

Failure to Exhaust Administrative Remedies

In their August 17, 2009, motion for judgment, defendants argued that plaintiff had failed to exhaust administrative remedies against nearly all defendants.  Doc. 192.  The court denied this motion on November 9, 2009.  Doc. 207.  Defendants also raised the failure to exhaust argument in their June 11, 2010, pretrial statement.  Doc. 234.  The court denied this argument in the Pretrial Order pointing to the court's prior ruling.  Doc. 236.  In the instant motion for summary judgment, defendants again raise the exhaustion argument.

Defendants' argument that plaintiff failed to exhaust his administrative remedies

---

[8] Plaintiff does not state when this occurred but presumably at some point in 2006.

is again denied.  Below is an excerpt from the court's prior opinion:

> Plaintiff filed the original complaint in this action on January 5, 2007, alleging violations of his civil rights and the Americans with Disabilities Act (ADA) at Mule Creek State Prison (MCSP), where he was housed.   Plaintiff alleged that he had been denied adequate medical care for knee problems and a rectal prolapse. Plaintiff alleged that he had been denied knee surgery, a walking cane, grab bars, crutches, a single cell due, cell meals and a raised toilet seat.  Plaintiff also alleged that defendants were improperly requiring him to use public restrooms.  Plaintiff also claimed that he had not been given an adequate job assignment.  On April 11, 2007, the court ordered service of defendants Smith, Grannis, Tedder, Nale, Campbell, Akintola, Garcia, Johnson, Reaves, Reyes and Kinnick.  FN

> FN  The court also ordered service of named defendants Cate and Azcona.  These individuals are no longer defendants in this action.

> On August 23, 2007, defendants first appeared in this action by filing a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  On December 5, 2007, the court recommended that  defendants' motion be denied as to the claims against Smith. The court ordered the motion granted with leave to amend as to the claims against the other defendants.

> On November 21, 2007, plaintiff filed a notice of change of address indicating his transfer to High Desert State Prison (HDSP).

> On May 29, 2008, plaintiff filed an amended complaint consisting of two separately filed documents, court file nos. 86 and 88.  The amended complaint names Grannis, Tedder, Nale, Campbell, Akintola, Garcia and Johnson as defendants.  Newly named as defendants Subia, Hamilton, Casperite, Hoepner, Williams, Cullen, Felker, Perez, Hale, James, Agyeman and Clark.  The amended complaint included allegations regarding conditions at MCSP and HDSP.  The claims against the newly named defendants at HDSP were similar to those raised against the defendants located at MCSP.

> On June 26, 2008, the court ordered the original defendants to answer the amended complaint and ordered service of the new defendants.  On August 26, 2008, the original defendants filed an answer to the amended complaint.  On November 4, 2008, newly named defendants Casperite, Felker, Hamilton, Hoepner, James, Perez and Subia filed an answer to the amended complaint.

> On November 10, 2008, the court issued a scheduling order setting the dispositive motion cut-off date for June 19, 2009.  On January 22, 2009, newly named defendants Hale, Clark, Agyeman and Williams filed an answer to the amended complaint.

> On February 27, 2009, defendants filed a motion to modify the scheduling order. Defendants requested that the court extend the discovery cut-off and dispositive motion filing dates because new defense counsel had been assigned.  On March 13, 2009, the court granted this motion, and re-set the dispositive motion cut-off date to August 19, 2009.

On August 17, 2009, defendants filed the pending motion to dismiss and for judgment on the pleadings.

*Analysis*

42 U.S.C. § 1997e(a) provides that, "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

Defendants' motion for failure to exhaust administrative remedies is brought pursuant to Fed. R. Civ. P.12(b).

Under Fed. R. Civ. P. 12(b), as to the specifically enumerated grounds 1 through 7, the rule announces that "[a] motion asserting any of these defenses must be made before pleading if a responsive pleading is allowed." This court finds that although this motion is one that is brought under the nonenumerated grounds of Rule 12(b), that, similarly, such a motion, generally, is timely when it, too, is brought prior to the filing of an answer. This is so because defendants have ready access to the CDCR records, or lack thereof, to support the motion and, if they do not, they have the means to seek an extension of time before filing an answer from the court to be permitted to gather the requisite information.

Moreover, the MCSP defendants appeared in this action two years ago. Since that time, the MCSP defendants have filed a motion to dismiss for failure to state a claim pursuant to Fed. R Civ. P. 12(b)(6) and an answer. The court has spent considerable resources on this action since that time.

Seven of the newly named HDSP defendants filed their answer nine months before the pending motion was filed. The other three newly named HDSP defendants on whose behalf the pending motion is brought filed their answer seven months before this motion was filed. Since the filing of the answers, considerable court time and resources have been spent on this action. For example, on March 24, 2009, and August 3, 2009, the court issued orders denying three motions to compel filed by plaintiff. Had defendants timely filed their motion to dismiss, the court most likely would not have had to devote the extensive time and resources it did to evaluating these motions.

This court has not been able to uncover any binding and conclusive authority on the issuance of the timeliness, or lack thereof, of a nonenumerated 12(b) motion; however, the undersigned finds that the reasoning set forth in a federal court in the Central District of California, where the district judge found defendant's motion to dismiss for nonexhaustion of administrative remedies, filed some ten months after the filing of the answer, untimely, best encapsulates the position of the undersigned:

> Moving Defendant cites no case law which indicates that the issue of exhaustion of administrative remedies may only be raised through a motion for summary judgment. On the contrary, the Ninth Circuit has repeatedly found that "failure to exhaust nonjudicial remedies is a matter in abatement, not going to the merits of the claim, and as such

16

> is not properly raised in a motion for summary judgment."
> *Ritza v. International Longshoremen's And Warehousemen's Union, et al.*, 837 F.2d 365, 368 (9th Cir.1988) (citation omitted); *Inlandboatmens Union of the Pacific v. Dutra Group*, 279 F.3d 1075, 1083 (9th Cir.2002) ("We have held that a failure to exhaust non-judicial remedies must be raised in a motion to dismiss, and should be treated as such even if raised as part of a motion for summary judgment.")
>
> Under previously existing Ninth Circuit case law, Moving Defendant should have brought his challenge to Plaintiff's claims based on failure to exhaust administrative remedies *through a timely motion to dismiss* rather than a motion for summary judgment.
>
> The Ninth Circuit allows a Rule 12(b) motion *any time before the responsive pleading is filed.* See *Aetna Life Ins. Co. v. Alla Medical Services, Inc.*, 855 F.2d 1470, 1474 (9th Cir.1988) (citing *Bechtel v. Liberty Nat'l Bank*, 534 F.2d 1335, 1340-41 (9th Cir.1976) (In *Bechtel*, the Ninth Circuit noted that "while some courts hold that Rule 12(b) motions must be made within 20 days of service of the complaint, the rule itself only requires that such motions 'be made before pleading if a further pleading is permitted." ')

Thomas v. Baca, 2003 WL 504755, *2 (C.D. Cal. 2003) [emphasis added].

While, of course, defendants have not brought this motion technically within a motion for summary judgment, but, instead have brought it two days before the dispositive motion cut-off date, the reasoning is no less apposite. The undersigned is aware of conflicting decisions at the district court level within this circuit, see, e.g., Rigsby v. Schriro, 2008 WL 2705376, *1 n. 2 (D. Ariz. 2008) (finding that, where defendant simultaneously filed an answer – asserting the failure to exhaust defense – and an unenumerated motion to dismiss for failure to exhaust administrative remedies, such a motion "need not be made before answering"); Tyner v. Schriro, 2008 WL 752612, *1 n. 1 (D. Ariz. 2008) (same); see also, Thrasher v. Garland, 2007 WL 3012615 *2 (W.D. Wash. 2007) (asserting that, although a motion to dismiss pursuant to the specifically enumerated grounds of Rule 12(b) should be brought before the answer is filed, a nonenumerated 12(b) motion "need not necessarily be brought prior to the filing of the answer."

However, this court finds the reasoning of Thomas v. Baca, supra, to better promote judicial efficiency and economy while at the same time limiting unfair prejudice to a pro se prisoner plaintiff.  As noted, the state attorney general has virtually unlimited access to CDCR records.  Defendants' counsel makes no effort whatever to explain why such a motion could not have been brought prior to the filing of the answer on behalf of these defendants, and prior to the time when this court had expended resources adjudicating discovery disputes and several motions

1  for injunctive relief as well as other matters.  Nor is the question of exhaustion, or
   lack thereof, of administrative remedies a jurisdictional one.  Wyatt v. Terhune,
2  315 F.3d 1108, 1119  n. 13 ("PLRA exhaustion is not a jurisdictional
   requirement.")  Accordingly, the undersigned will not reach the merits of
3  defendants' 12(b) motion as this court finds the motion to be untimely.

4  November 9, 2009, Findings & Recommendations at 2-6.[9]

5  For these same reasons, defendants' request to dismiss for failure to exhaust is

6  denied.

7      Eighth Amendment

8          Legal Standard

9          In order to state a § 1983 claim for violation of the Eighth Amendment based on

10  inadequate medical care, plaintiff must allege "acts or omissions sufficiently harmful to evidence

11  deliberate indifference to serious medical needs."  Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct.

12  285, 292 (1976).  To prevail, plaintiff must show both that his medical needs were objectively

13  serious, and that defendants possessed a sufficiently culpable state of mind.  Wilson v. Seiter,

14  501 U.S. 294, 299, 111 S. Ct. 2321, 2324 (1991); McKinney v. Anderson, 959 F.2d 853 (9th Cir.

15  1992) (on remand).  The requisite state of mind for a medical claim is "deliberate indifference."

16  Hudson v. McMillian, 503 U.S. 1, 4, 112 S. Ct. 995, 998 (1992).

17          A serious medical need exists if the failure to treat a prisoner's condition could

18  result in further significant injury or the unnecessary and wanton infliction of pain.  Indications

19  that a prisoner has a serious need for medical treatment are the following:  the existence of an

20  injury that a reasonable doctor or patient would find important and worthy of comment or

21  treatment; the presence of a medical condition that significantly affects an individual's daily

22  activities; or the existence of chronic and substantial pain.  See, e.g., Wood v. Housewright, 900

23  F. 2d 1332, 1337-41 (9th Cir. 1990) (citing cases); Hunt v. Dental Dept., 865 F.2d 198, 200-01

24  (9th Cir. 1989).  McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled on other

25

26      [9] The findings and recommendations were adopted on December 23, 2009.  Doc. 211.

18

1    grounds, WMX Technologies v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

2              In Farmer v. Brennan, 511 U.S. 825, 114 S. Ct. 1970 (1994) the Supreme Court

3    defined a very strict standard which a plaintiff must meet in order to establish "deliberate

4    indifference."  Of course, negligence is insufficient.  Farmer, 511 U.S. at 835, 114 S. Ct. at 1978.

5    However, even civil recklessness (failure to act in the face of an unjustifiably high risk of harm

6    which is so obvious that it should be known) is insufficient.  Id. at 836-37, 114 S. Ct. at 1979.

7    Neither is it sufficient that a reasonable person would have known of the risk or that a defendant

8    should have known of the risk.  Id. at 842, 114 S. Ct. at 1981.

> A prison official acts with "deliberate indifference ... only if the [prison official] knows of and disregards an excessive risk to inmate health and safety." Gibson v. County of Washoe, Nevada, 290 F.3d 1175, 1187 (9th Cir.2002) (citation and internal quotation marks omitted).  Under this standard, the prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but that person "must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). "If a [prison official] should have been aware of the risk, but was not, then the [official] has not violated the Eighth Amendment, no matter how severe the risk." Gibson, 290 F.3d at 1188 (citation omitted). FN4 This "subjective approach" focuses only "on what a defendant's mental attitude actually was." Farmer, 511 U.S. at 839, 114 S.Ct. 1970. "Mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights." McGuckin, 974 F.2d at 1059 (alteration and citation omitted).
>
> > FN4. In a recent case, we recognized that "deliberate indifference to medical needs may be shown by circumstantial evidence when the facts are sufficient to demonstrate that a defendant actually knew of a risk of harm." Lolli v. County of Orange, 351 F.3d 410, 421 (9th Cir.2003) (citations omitted); see also Gibson, 290 F.3d at 1197 (acknowledging that a plaintiff may demonstrate that officers "must have known" of a risk of harm by showing the obvious and extreme nature of a detainee's abnormal behavior).

25   Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir. 2004).

26   ////

1    Also significant to the analysis is the well established principle that mere

2    differences of opinion concerning the appropriate treatment cannot be the basis of an Eighth

3    Amendment violation.  Jackson v. McIntosh, 90 F.3d 330 (9th Cir. 1996); Franklin v. Oregon,

4    662 F.2d 1337, 1344 (9th Cir. 1981).

5    Moreover, a physician need not fail to treat an inmate altogether in order to violate

6    that inmate's Eighth Amendment rights.  Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir.

7    1989).  A failure to competently treat a serious medical condition, even if some treatment is

8    prescribed, may constitute deliberate indifference in a particular case.  Id.

9    Additionally, mere delay in medical treatment without more is insufficient to state

10   a claim of deliberate medical indifference.  Shapley v. Nevada Bd. of State Prison Com'rs, 766

11   F.2d 404, 408 (9th Cir. 1985).  Although the delay in medical treatment must be harmful, there is

12   no requirement that the delay cause "substantial" harm.  McGuckin, 974 F.2d at 1060, citing

13   Wood v. Housewright, 900 F.2d 1332, 1339-1340 (9th Cir. 1990) and Hudson, 112 S. Ct. at 998-

14   1000.  A finding that an inmate was seriously harmed by the defendant's action or inaction tends

15   to provide additional support for a claim of deliberate indifference; however, it does not end the

16   inquiry.  McGuckin, 974 F.2d 1050, 1060 (9th Cir. 1992).  In summary, "the more serious the

17   medical needs of the prisoner, and the more unwarranted the defendant's actions in light of those

18   needs, the more likely it is that a plaintiff has established deliberate indifference on the part of

19   the defendant."  McGuckin, 974 F.2d at 1061.

20   Superimposed on these Eighth Amendment standards is the fact that in cases

21   involving complex medical issues where plaintiff contests the type of treatment he received,

22   expert opinion will almost always be necessary to establish the necessary level of deliberate

23   indifference.  Hutchinson v. United States, 838 F.2d 390 (9th Cir. 1988).  Thus, although there

24   may be subsidiary issues of fact in dispute, unless plaintiff can provide expert evidence that the

25   treatment he received equated with deliberate indifference thereby creating a material issue of

26   fact, summary judgment should be entered for defendants.  The dispositive question on this

1   summary judgment motion is ultimately <u>not</u> what was the most appropriate course of treatment

2   for plaintiff, but whether the failure to timely give a certain type of treatment was, in essence,

3   criminally reckless.

4               Discussion[10]

5               As stated above, plaintiff has attempted to frame his ADA claims such as the

6   denial of crutches or bathroom grab bars, also as Eighth Amendment claims for deliberate

7   indifference.  The court will not address many of these claims as they are not properly brought as

8   Eighth Amendment claims and will be discussed below in the ADA section.  The court will

9   address a few defendants who appear to only be in this action for their roles related to plaintiff's

10  ADA claims, but plaintiff has attempted to link them to Eighth Amendment claims.  As will be

11  discussed, it is clear none of their actions constitute deliberate indifference.  Finally, plaintiff has

12  attempted to add Eighth Amendment claims against Campbell and Subia which the court will not

13  address as the defendants are only in this action with respect to the ADA claim.

14              While denying crutches or lay ins could potentially rise to the level of an Eighth

15  Amendment claim, plaintiff's allegations involve his comfort and ability to use prison services,

16  which are properly brought under the ADA.  Ultimately, it is not entirely clear what are

17  plaintiff's Eighth Amendment claims other than a general dissatisfaction regarding the treatment

18  he received for his knee and rectal prolapse.

19              It is undisputed that during the relevant period, plaintiff received 67 primary care

20  physician visits, 43 with medical doctors and the remaining 24 with physicians assistants or nurse

21  practitioners.   From 2003 to 2007, plaintiff received three surgeries by independent outside

22  medical facilities, one to repair his rectal prolapse and two ACL reconstructions.  From 2003 to

23

24          [10]  The court need not resolve the various evidentiary objections as defendant's motion
      can be resolved without recourse to the disputed evidence of defendant, and it can be resolved as
25    well in accepting the disputed evidence submitted by plaintiff.  In other words, the benefit of the
      evidentiary rulings have been assumed in plaintiff's favor.  However, this does not mean that
26    plaintiff's evidence on its face is sufficient to withstand summary judgment.

2007, plaintiff received numerous gastroenterolology consultations with UC Davis physicians

concerning is rectal prolapse and numerous orthopedic consultations with outside orthopedists.

From 2003 to 2007, plaintiff received five x-rays of his knee over a two-year period and two

MRIs of his knee over a four-year period.

Finally, simply stating in his declaration that he received improper treatment,

without detail or support is insufficient.  "Conclusory affidavits that do not affirmatively show

personal knowledge of specific facts are insufficient [to defeat summary judgment].'"

Intermountain Fair Housing v. Boise Rescue, __F.3d__, __WL __, Slip Op. 10-35519 at 17773

(9th Cir. September 19, 2011).

<u>Dr. Smith and Dr. Nale</u>

Plaintiff argues that Dr. Smith unnecessarily delayed his rectal prolapse surgery.

However, it is undisputed that plaintiff's rectal prolapse first came to the attention of MCSP staff

on October 28, 2003.  Surgical intervention through an outside provider was requested on an

urgent basis and approved two days later on October 30, 2003.  Plaintiff was evaluated by UC

Davis Medical Center on November 5, 2003, and because plaintiff's condition worsened quickly

he was taken to UC Davis where emergency rectal prolapse surgery was performed on December

26, 2003.

Plaintiff argues the surgery was delayed by 21 months, though it is clear it

occurred within two months of plaintiff's first complaint.  Even if plaintiff were to argue that the

two month delay was improper, it is abundantly clear that Dr. Smith and MCSP staff properly

treated plaintiff.  Plaintiff was immediately referred to UC Davis and seen within a week of his

first complaint and immediately scheduled for surgery when his condition worsened.  This

allegation is frivolous.[11]

---

[11] Plaintiff's opposition states that non defendant Dr. Vidovsky stated that plaintiff's
rectal prolapse condition progressed too far due to the delay in surgery and nothing could be
done.  Opposition at 35.  However, the citation to that statement refers to a page from plaintiff's

1   There are also no genuine issues as to any material fact with respect to Dr. Nale.

2   It is undisputed that Dr. Nale saw plaintiff to confirm an outside appointment for an orthopedic

3   consult when plaintiff mentioned his knee was bothering him due to sitting for long periods of

4   time in his education assignment.  As a result plaintiff wanted a medical lay in and in cell feed,

5   but Dr. Nale found nothing significant to warrant this, and instead renewed plaintiff's knee brace

6   chrono.  No facts have been presented demonstrating that Dr. Nale's denial of a medical lay in or

7   cell feed on this one occasion was in violation of the Eighth Amendment.

8   Plaintiff also alleges that Dr. Smith and Dr. Nale violated the Eighth Amendment

9   by denying him at different times crutches, grab bars and a commode chair.  As stated above,

10  these claims will be discussed as a violation of the ADA below.

11  For all these reasons, defendants motion for summary judgment with respect to

12  these defendants violating the Eighth Amendment should be granted.

13  <u>Dr. Williams</u>

14  Dr. Williams was involved with plaintiff's 2003 grievance, requesting a walking

15  cane.  It is undisputed that Dr. Williams actually continued the walking cane chrono until

16  plaintiff had an outside orthopedic evaluation in December 2003.  Plaintiff either did not show

17  up for the orthopedic evaluation or was never called for it by prison officials.  Regardless, there

18  are no further facts concerning the cane chrono and Dr. Williams.  Plaintiff has failed to show

19  that Dr. Williams continuing the cane chrono until an orthopedic evaluation violates the Eighth

20  Amendment.

21  Dr. Williams then reviewed a 2007 grievance where plaintiff requested to know if

22  he was getting the knee surgery that was promised.  Dr. Williams responded that plaintiff was

23  receiving the knee surgery but could not be told the exact date for security concerns.  This

24  presents no claim.

25  

26  own deposition that does not even refer to Dr. Vidosky.

1    The parties dispute whether Dr. Williams ever personally treated plaintiff.

2    Assuming arguendo that plaintiff's factual assertions are correct, the court will assume that Dr.

3    Williams treating plaintiff four times for his knee and rectal prolapse.  However, there are no

4    further facts presented on what treatment Dr. Williams actually provided.  Simply stating in his

5    declaration that Dr. Williams provided improper treatment, without discussing the treatment is

6    insufficient.  "Conclusory affidavits that do not affirmatively show personal knowledge of

7    specific facts are insufficient [to defeat summary judgment].'" Intermountain Fair Housing v.

8    Boise Rescue, __F.3d__, __WL __, Slip Op. 10-35519 at 17773 (9th Cir. September 19, 2011).

9    Summary judgment is granted for Dr. Williams on this claim.

10                Akintola

11    The claim against Akintola arises from him denying a medical lay in for plaintiff

12   and allegedly telling plaintiff to take some ibuprofen and deal with his daily problems.  Plaintiff

13   alleges that the following day he was attempting to make a grab bar out of a garbage can when he

14   fell and injured himself.  Amended Complaint (Doc. 86) at 10.  Other than this allegation, there

15   are no facts presented against Akintola.  It is not even clear why plaintiff was in pain and how the

16   failure to be provided a lay in was deliberately indifferent.  That plaintiff fell while trying to

17   make a grab bar out of a garbage can cannot be attributed to Akintola and plaintiff has failed to

18   present any material facts to successfully oppose summary judgment for this defendant.

19                Americans with Disabilities Act

20    The absence of a deliberate indifference claim was never much in doubt in the

21   undersigned's mind.  Rather, the ADA claim appeared at one time to be the claim with some

22   potential merit as plaintiff, at times, did have significantly problematic medical issues.  However,

23   the specifics of that claim are *still* lacking given the lengthy period of time at issue, the waxing

24   and waning of plaintiff's medical condition, and the lack of any link-up of plaintiff's condition at

25   a specific time to any alleged discrimination.  For example, during those periods when plaintiff

26   did have a cane, how did this accommodation affect his ability to receive education classes?  Did

1   it solve the problem, or was there some other problem hindering his attendance at a specific

2   time?  Or how would a grab bar in his cell have made any difference to the ADA case, i.e., what

3   programs or services were impeded (within the parameters of the Pretrial Order) by the lack of a

4   grab bar in plaintiff's cell (or is plaintiff claiming that grab bars were necessary in every possible

5   bathroom with which plaintiff may have come in contact within the prison?).  Plaintiff makes no

6   specification of the period of time(s) in which deliberate indifference was exhibited towards his

7   disabilities (a necessary finding given that plaintiff's only ADA claim at this point is one for

8   damages).  As set forth earlier, the parties, especially plaintiff, wander about with allegations and

9   arguments making this adjudication an exercise in frustration.  Adjudicating the ADA claim on

10   summary judgment is akin to grappling with the invisible man.

11         Legal Standard

12         Title II of the ADA "prohibit[s] discrimination on the basis of disability."  Lovell

13   v. Chandler, 303 F.3d 1039, 1052 (9th Cir. 2002).  Title II provides that "no qualified individual

14   with a disability shall, by reason of such disability, be excluded from participation in or be denied

15   the benefits of the services, programs, or activities of a public entity, or be subject to

16   discrimination by such entity."  42 U.S.C. § 12132.  Title II of the ADA applies to inmates within

17   state prisons.  Pennsylvania Dept. of Corrections v. Yeskey, 524 U.S. 206, 118 S.Ct. 1952, 1955

18   (1998); see also Armstrong v. Wilson, 124 F.3d 1019, 1023 (9th Cir. 1997); Duffy v. Riveland,

19   98 F.3d 447, 453-56 (9th Cir. 1996).

20         In order to state a claim that a public program or service violated Title II of the

21   ADA, a plaintiff must show: (1) he is a "qualified individual with a disability"; (prerequisite) he

22   was either excluded from participation in or denied the benefits of a public entity's services,

23   programs, or activities, or was otherwise discriminated against by the public entity; and (3) such

24   exclusion, denial of benefits, or discrimination was by reason of his disability.  McGary v. City

25   of Portland, 386 F.3d 1259, 1265 (9th Cir. 2004).

26         A "disability" is defined by the ADA as "a physical or mental impairment that

1  substantially limits one or more of the major life activities of such individual."  42 U.S.C. §

2  12102(2)(A).   The court will not debate at length here on summary judgment whether plaintiff

3  suffered from a disability.  At the very least, there is an issue of fact that plaintiff's rectal

4  prolapse and knee condition affected one or more of plaintiff's major life activities.  Given the

5  prison environment, the rectal prolapse condition could clearly affect plaintiff's ability to be with

6  other prisoners.

7  However, it is also important to emphasize that a disability alone is not the sole

8  prerequisite for an ADA claim.  It is not enough that defendants did not make plaintiff's life in

9  prison more comfortable or easy in every respect in light of his disability.  See Memmer v. Marin

10  County Courts, 169 F.3d 630, 633 (9th Cir. 1999).  Rather, plaintiff must show that defendants

11  discriminated against him in terms of making prison programs and activities available to him

12  when compared to non-disabled inmates.  See Brown v. City of Los Angeles, 521 F.3d 1238,

13  1241 (9th Cir. 2008).  At least part of plaintiff's claim herein, and that which is assuredly not

14  actionable, is that plaintiff's prison conditions in general were not made more palatable.

15  Although § 12132 does not expressly provide for reasonable accommodations, the

16  implementing regulations provide that "[a] public entity shall make reasonable modifications in

17  policies, practices, or procedures when the modifications are necessary to avoid discrimination

18  on the basis of disability, unless the public entity can demonstrate that making the modifications

19  would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. §

20  35.130(b)(7).  The duty to provide "reasonable accommodations" or "reasonable modifications"

21  for disabled people under Title II of the ADA arises only when a policy, practice or procedure

22  discriminates on the basis of disability.  Weinreich v. Los Angeles County MTA, 114 F.3d 976,

23  979 (9th Cir. 1997).

24  Moreover,  plaintiff bears the burden of proof to establish "the existence of

25  specific reasonable accommodations" that the prison failed to provide.  Memmer, 169 F.3d at

26  633 (emphasis added) citing Weinreich,  supra.  In this summary judgment context, plaintiff

bears the burden of demonstrating an issue of fact that what he proposed was indeed necessary and reasonable.  This requirement has some temporal ramifications in that an accommodation, reasonable and necessary at some time within a four year stretch, may not be reasonable and/or necessary at other times.  Plaintiff must relate the lack of a reasonable accommodation to a particular program or activity which correlates to his medical condition *at the time he could not participate or was unduly impeded in his participation*.  In many cases, a plaintiff's condition will not vary, e.g., he must use a wheelchair at all times, or plaintiff is blind.  The need for and extent of accommodations necessary for programs and activities will therefore generally also not significantly vary over time.  In other cases, such as this one, the varying severity of the condition at the time of the allegedly denied program/activity, e.g., painful knee, may well define the necessary accommodation, or the fact that no accommodation is necessary.  A less painful knee may require no accommodations and a debilitating knee condition may well require significant accommodation.  For example, does plaintiff contend that his knee condition required an accommodation to attend education classes when he was indisputedly able to play basketball on this knee?  The ADA does not presume that the severity, or even existence, of all disabilities extant at one time are forever.  Therefore, it was incumbent upon plaintiff to temporally relate his precise medical condition to the time of the alleged program/activity impedance.  As seen *infra*, this, he has not done at all.

Causation in ADA cases is also important.  Plaintiff must produce an issue of fact here that his exclusion from programs or activities, or other significant impedance to the benefits of such programs, was "solely by reason of his disability."  Lee v. City of Los Angeles, 250 F.3d 668, 691 (9th Cir. 2001).  See also Martin v. Cal. Dept. Of Veteran Affairs, 560 F.3d 1042, 1049 (9th Cir. 2009).

The Ninth Circuit has held that the prison context is of special relevance to an otherwise generic ADA claim.  "[W]e have held that inmates' rights must be analyzed 'in light of effective prison administration.'"...[I]nmates claims that their rights under the Rehabilitation Act

1  [same standards as an ADA claim, see n. 27]] had been violated were subject to the so-called

2  'reasonable relation" standard articulated in Turner, 482 U.S. at 89, 107 S.Ct. 2254. [footnote

3  omitted]. Under Turner, a regulation that would impinge on inmates' constitutional rights is

4  nevertheless valid if it is reasonably related to the prison's legitimate interests." Pierce v. County

5  of Orange, 526 F.3d 1190, 1216 (9th Cir. 2008). Defendants proffer here that several of

6  plaintiff's requested accommodations would have implicated prison safety, yet plaintiff makes no

7  mention of this.

8         Plaintiff may bring a claim under Title II of the ADA against state entities for

9  damages.[12]  See Phiffer v. Columbia River Correctional Institute, 384 F.3d 791 (9th Cir. 2004).

10  However, the standard for recovery of such damages is deliberate indifference to plaintiff's rights

11  under the ADA. Plaintiff cites the correct case, Duvall v. County of Kitsap, 260 F.3d 1124, 1138

12  (9th Cir. 2001), and its correct holding: "Deliberate indifference requires both knowledge that a

13  harm to a federally protected right is substantially likely, and a failure to act upon that

14  likelihood." However, in part, plaintiff does not relate his arguments to denial of rights under the

15  ADA. At best the evidence simply shows a disagreement between plaintiff and prison officials.

16         Discussion

17         Plaintiff contends that his rectal prolapse and knee problems qualify him as a

18  disabled individual, which defendants dispute.[13]  However, for purposes of the instant motion the

19  court will assume that plaintiff is disabled. As stated before, at least for some time during the

20  period at issue in this case, plaintiff had serious, but varying in severity, medical conditions

21  which would easily meet the definition of causing impairment of a major life activity.

22          Nevertheless, summary judgment should be granted as it has not been shown in

23

24         [12] Again, injunctive relief is a moot issue.

25         [13] The court will only consider plaintiff's rectal prolapse and knee problems. The other
   ailments that plaintiff discusses will be disregarded as they have never been or are no longer part
26  of this action.

28

1  any meaningful way that the prison and its officials were deliberately indifferent in excluding

2  plaintiff from participation in or denied the benefits of the prison's services, programs, or

3  activities, or was otherwise deliberately indifferent in discriminating against plaintiff.

4          First, plaintiff has not shown that he was denied access, or had his access

5  unlawfully impeded, to any prison activity *solely on account of his disability*.  The only activity

6  that plaintiff urges as a violation concerned his inability, on occasion, to attend educational

7  classes.  Plaintiff argues: that he was unable to attend classes on at least three occasions due to

8  being in the bathroom too long in the morning.  Opposition at 42.  The only conclusion that can be

9  drawn form such a statement is that plaintiff's *condition* made it not possible to attend class on

10  those occasions, not that he was denied accommodations which he requested which would have

11  made it possible to attend the classes on those occasions.

12          Plaintiff alleges that at different times he was denied grab bars, crutches, a cane

13  and a commode chair.  A commode chair in his cell may have made plaintiff's life more

14  comfortable, but how would it have enabled him to make class?  The same is true for an in-cell

15  grab bar.  It is true that plaintiff's knee condition may have been aided at times by crutches and

16  canes, which in turn would have facilitated attendance at class, however, these claims are

17  complicated as plaintiff's allegations span several years and it is undisputed that in many

18  occasions plaintiff was provided with some or most of these accommodations, though not all of

19  them right from the start.

20          During the relevant period from October 2003 to November 2007, it is undisputed

21  that plaintiff was provided with dozens of medical chronos for crutches, a cane, medical lay ins, in

22  cell feeds, single cell housing, low bunk, low floor housing, special consideration for work and

23  education assignments, special access to bathrooms during work and classes, adult diapers and a

24  colostomy bag.  In fact, when some accommodations were denied, others accommodations were

25  provided for plaintiff.  While plaintiff was not provided with grab bars from the initiation of his

26

1   knee probelms, he was provided with a commode chair.[14]  Plaintiff expressly concedes in his

2   opposition, as he quotes defendant's counsel in demonstrating that plaintiff was perceived to have

3   a disability, that plaintiff was at times "'provided [ ] with crutches, had a cane for most of the time

4   he was at MSCP, as well as near proximity/access to a bathroom chrono [i.e. preferred bathroom

5   access], medical lay-ins, cell feeds, sack lunches, and single cell status.'" Opposition at 39.

6          But even if plaintiff could show that the partial denial of all his requested

7   accommodations at any time could result in a violation of the ADA, the case for finding deliberate

8   indifference is entirely absent.  The above accommodations given were the sum total (and more)

9   of what was listed in the Pretrial Order as accommodations which were allegedly denied to

10  plaintiff.  Apparently, even according to plaintiff, they were not denied.  It is difficult to

11  understand how giving plaintiff these accommodations results in deliberate indifference.  If

12  plaintiff means to argue that he was not given these accommodations at *specific* times, it was

13  incumbent upon plaintiff to specifically demark the time at which plaintiff did not have an above

14  listed accommodation, and why the lack of whatever accommodation plaintiff did not have

15  exhibited deliberate indifference.  This has not been done at all.

16          In addition, the undisputed evidence shows that plaintiff was provided adult

17  diapers, which he ceased using after a short time.  Plaintiff was also offered the use of a

18  colostomy bag, however plaintiff declined this offer.  It is difficult to conceive how all of the

19  suggested and given accommodations could result in a finding of deliberate indifference. [15]

20  _____

21          [14] The court notes that plaintiff was not provided a commode chair until 2007, though he
    has failed to show that the lack of one until that time violated the ADA.

22

23          [15] Plaintiff seemingly recognizes that his deliberate indifference case is non-existent under
    the accommodations given as he *now* argues that he should have been given in-cell studies in lieu
24  of, or in addition to, all of the other accommodations.  Not only is this request not part of the
    Pretrial Order, but plaintiff goes no distance in presenting an issue of fact that this was a
25  *reasonable* accommodation.  Plaintiff goes no distance in establishing the times at which this
    particular (and undoubtedly burdensome) accommodation was required, even if reasonable.  And
26  finally, even assuming that plaintiff had made out a case that at some particular time he was
    required to have been given this accommodation, the universe of accommodations that were

1        Plaintiff seemingly recognizes that his deliberate indifference case is non-existent

2   under the accommodations given as he *now* argues that he should have been given in-cell studies

3   in lieu of, or in addition to, all of the other accommodations.  Not only is this request not part of

4   the Pretrial Order, but plaintiff goes no distance in presenting an issue of fact that this was a

5   *reasonable* accommodation.  Plaintiff goes no distance in establishing the times at which this

6   particular (and undoubtedly burdensome) accommodation was required, even if reasonable.  And

7   finally, even assuming that plaintiff had made out a case that at some particular time he was

8   required to have been given this accommodation, the universe of accommodations that were given

9   to plaintiff robs this argument of any merit vis-a-vis a finding of deliberate indifference.

10       Moreover, much of plaintiff's arguments regard how his disabilities effected his

11  life in general and were not properly treated by medical staff.  "Instances of this include but are

12  not limited to follow up with surgery for 21 months after instruction from  Dr. Vidovsky that it

13  should be done in three, after which Dr. Vidovsky said the rectal prolapse condition had

14  progressed too far and nothing could be done."  Opposition at 42.  Not only are these facts

15  divorced from the established facts of this case, the undisputed facts show that plaintiff had

16  surgery *days* after he reported it serious, and getting much worse, but this is not pertinent in

17  examining an ADA claim.  The treatment or lack of medical treatment for plaintiff's condition

18  does not provide a basis upon which to impose liability.  Burger v. Bloomberg, 418 F.3d 882 (8th

19  Cir. 2005) (medical treatment decisions not basis for ADA claims); Fitzgerald v. Corr. Corp. of

20  Am., 403 F.3d 1134, 1144 (10th Cir. 2005) (medical decisions not ordinarily within the scope of

21  the ADA); Bryant v. Madigan, 84 F.3d 246, 249 (7th Cir. 1996) ("The ADA does not create a

22  remedy for medical malpractice.").[16]

23  _____

24   given to plaintiff robs this argument of any merit vis-a-vis a finding of deliberate indifference.

25       [16] Also, plaintiff argues that he should have had a single cell.  This is not what was set
    forth in the Pretrial Order as a needed accommodation.  But even if it was, plaintiff (again)
26  concedes that he was given this status at least at some time.  More importantly, although single

1    Thus, MCSP staff provided plaintiff many accommodations and options to aid

2    plaintiff's disability and allow plaintiff to have benefit of all the prison's services and benefits.

3    Even if the court is in error that plaintiff, at some time, had set forth a case that some

4    accommodation denied at some time should have been given, plaintiff without doubt has not set

5    forth a material issue of fact regarding deliberate indifference to plaintiff's right under the ADA.

6    <u>State Claims</u>

7    Defendants also move to dismiss plaintiff's state law claims, arguing that the

8    claims should be dismissed because plaintiff did not plead compliance with the California Torts

9    Claims Act ("GCA").[17]   The GCA requires that a party seeking to recover money damages from a

10   public entity or its employees must submit a claim to the entity before filing suit in court,

11   generally no later than six months after the cause of action accrues.  Cal. Gov't Code §§ 905,

12   911.2, 945, 950.2; <u>see also</u> <u>Shirk v. Vista Unified Sch. Dist.</u>, 42 Cal. 4th 201, 208 (2007) ("Before

13   suing a public entity, the plaintiff must present a timely written claim. . .").  "The legislature's

14   intent to require the presentation of claims before suit is filed could not be clearer."  <u>City of</u>

15   <u>Stockton v. Super. Ct.</u>, 42 Cal. 4th 730, 746 (2007) ("The purpose of providing public entities

16   with sufficient information to investigate claims without the expense of litigation is not served if

17   the entity must file a responsive pleading alerting its opponent to the claim requirements.").

18   Timely claim presentation is not merely a procedural requirement of the GCA but is an element of

19   a plaintiff's cause of action.  <u>Shirk</u>, 42 Cal. 4th at 209.  Thus, when a plaintiff asserts a claim

20   subject to the GCA, he must affirmatively allege compliance with the claim presentation

21   procedure, or circumstances excusing such compliance, in his complaint.  <u>Id</u>.  The requirement

22   that a plaintiff asserting claims subject to the GCA must affirmatively allege compliance with the

23   _____

24   cell status may well have made plaintiff more comfortable, he does not relate this request at all to
     any deprivation of prison programs or activities.

25   [17] In 2007, the California Supreme Court adopted the practice of using the title
     "Government Claims Act" instead of "California Tort Claims Act."  <u>See</u> <u>City of Stockton v.</u>
26   <u>Superior Court</u>, 42 Cal. 4th 730, 741-42 (2007).

1 │ claims filing requirement applies in federal court as well.  <u>Karim-Panahi v. Los Angeles Police</u>

2 │ <u>Dep't</u>, 839 F.2d 621, 627 (9th Cir. 1988).

3 │    In the instant case, plaintiff concedes in his opposition that he has not yet complied

4 │ with the GCA.  Plaintiff seeks equitable tolling to allow these claims to continue, without

5 │ providing any *factual* reasons as to why he failed to comply with the GCA or why he should

6 │ receive tolling.  Plaintiff's request is denied and the state law claims against defendants are

7 │ dismissed.

8 │    Accordingly, IT IS HEREBY ORDERED that:

9 │    Defendants' motion for summary judgment filed on February 25, 2011 (Doc. 292)

10 │ is granted and this case is closed.

11 │ DATED: September 22, 2011

12 │      <u> /s/ Gregory G. Hollows   </u>
       UNITED STATES MAGISTRATE JUDGE

13 │ GGH: AB
anay0029.sj(2)